IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DAWN SIMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-1220-MLB-DWB |
| | ) | |
| HOSPIRA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW the plaintiff, Dawn Simpson ("Plaintiff"), and for her claims of relief against the defendant, Hospira, Inc. ("Defendant"), alleges and states as follows:

### THE PARTIES

1. Plaintiff is an individual who resides in McPherson, Kansas.

2. Defendant is a Delaware corporation doing business in Kansas. Defendant may be served with process by serving its resident agent, The Corporation Company, Inc., 515 South Kansas Ave., Topeka, Kansas 66603. Defendant's principal corporate headquarters are located at 275 N. Field Dr., Lake Forest, IL 60045.

### JURISDICTION AND VENUE

3. This Court has federal question and diversity jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because Defendant, a corporation, is subject to personal jurisdiction in Kansas.

## BACKGROUND

5. Defendant develops, manufactures and markets pharmaceutical products.

6. Since 1997, Defendant has operated and continues to operate a manufacturing plant ("Plant") in McPherson, Kansas.

7. Plaintiff began working at the Plant in November 1976 in a variety of production positions. In June 1997, Plaintiff was promoted to Production Supervisor. In October 2000, she was offered and accepted a lateral transfer to the Quality Department as a Batch Release Supervisor, where she remained employed until September 2007 when Defendant unlawfully discharged her and refused to reinstate her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and the Kansas Act Against Discrimination ("KAAD"), K.S.A. § 44-1001 *et seq.*

8. In February 2006, Plaintiff suffered a stroke.

9. Defendant placed Plaintiff on medical leave until May 2006 when she attempted to return to her job.

10. Plaintiff returned to her job on May 24, 2006, but shortly thereafter she began experiencing problems with her vision. According to Plaintiff's doctors, Dr. Overholt and Dr. Rettig, the vision problems stemmed from the stroke and could be corrected with a new lens prescription for her glasses.

11. Defendant placed Plaintiff back on medical leave pending her new lens prescription.

12. Sometime on or before June 29, 2006, without Plaintiff's knowledge, Defendant posted Plaintiff's job on the company's internal bid board for other employees to apply for the position. When Plaintiff learned about this, she frantically contacted Defendant. Defendant

initially implied that Plaintiff would not be permitted to return to her job, but when pressed, Defendant acknowledged that Plaintiff would be allowed to return to her job if she obtained a full release from Dr. Overholt by July 10, 2006.

13. Plaintiff, upon receiving her new lens prescription, was released by Dr. Overholt to return to work without any restrictions as of July 10, 2006.

14. Despite the full release without restrictions that Defendant requested, Defendant refused to allow Plaintiff to return to work. Defendant requested additional information from Dr. Overholt as to why Plaintiff had been unable to return to work earlier.

15. Plaintiff nevertheless reported to work on July 10, 2006, but Defendant refused to allow Plaintiff to return to work and escorted her off the company premises.

16. Defendant sent a job analysis form to Dr. Overholt inquiring whether Plaintiff was able to perform the essential functions of her job.

17. Dr. Overholt reported that Plaintiff was fully capable of performing the essential functions of her job and recommended her full reinstatement without restrictions.

18. Following Dr. Overholt's report to Defendant, Plaintiff contacted Lori Pauley, in Defendant's human resources department, to confirm that Defendant had received all of the information it had requested. Ms. Pauley indicated that all of the requested information was received and looked good. She also indicated that the corporate office had reviewed the matter, but Defendant now wanted verbal confirmation from Dr. Overholt that Plaintiff was released to return to work.

19. Dr. Overholt again reassured Defendant that Plaintiff was released to perform her job without restrictions.

20. Defendant, nevertheless, demanded that Plaintiff submit to cognitive testing.

3

21. Defendant suggested for the first time that it did not believe Plaintiff could perform the essential functions of her job.

22. The cognitive test results supposedly indicated that Plaintiff exhibited deficits in: her ability to process visual information in an organized, meaningful manner; tracking/sequencing skills; mental processing speed; attention/concentration; verbal fluency; constructional abilities; and attention to visual details.

23. On several occasions, Plaintiff requested reasonable accommodations from Defendant, such as a probationary period to demonstrate that she could perform the essential functions of her job, additional job-related testing, and additional short-term oversight and supervision. All of Plaintiff's requests for reasonable accommodations were summarily rejected by Defendant with little or no explanation.

24. Defendant informed Plaintiff that she would not be permitted to return to her job as Batch Release Supervisor. Instead, she was presented with three options: (A) accept another unidentified position in the production department; (B) apply for long-term disability benefits; or (C) resign her employment.

25. Plaintiff thoroughly enjoyed her job, so she was not interested in applying for long-term disability benefits or resigning. She inquired about other openings in the production department, but, upon doing so, Defendant strongly urged Plaintiff to apply for long-term disability benefits. Defendant indicated that it could not offer any jobs to Plaintiff without the approval of the corporate doctor.

26. Plaintiff again asked Defendant what jobs, if any, were available in production. Defendant identified three openings: (A) Group Leader on the 12-hour day/night shift at $19.58

per hour; (B) Attendant on the 12-hour day/night shift at $17.71 per hour; and (C) Assistant on the 1st shift at $15.30 per hour.

27. Plaintiff earned approximately $65,000.00 per year in wages, excluding benefits, before suffering a stroke. All of the production jobs that were proposed by Defendant would have required Plaintiff to accept a substantial reduction in pay.

28. Defendant eventually notified Plaintiff that she would be eligible only for the Assistant position – the lowest paid of the three that were originally proposed to Plaintiff – but only after another round of cognitive testing.

29. Plaintiff, at Defendant's strong urging, eventually applied for long-term disability benefits in order to receive some sort of income while Defendant was deciding which jobs, if any, it was willing to offer to Plaintiff.

30. Effective September 20, 2007, Defendant terminated Plaintiff's employment because, according to Defendant, Plaintiff was on medical leave for longer than 12 months and her medical records "reflect the need for an indefinite medical leave."

31. Plaintiff was ready, willing and able to return to work with or without reasonable accommodations, but she was prevented from doing so by Defendant.

32. On September 7, 2006, Plaintiff timely filed a charge with the Equal Employment Opportunity Commission and the Kansas Human Rights Commission alleging discrimination in violation of the ADA and the KAAD.

33. On May 7, 2008, the Equal Employment Opportunity Commission issued to Plaintiff a Notice of Right to Sue.

5

**COUNT ONE – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

34.     Plaintiff incorporates by reference, as if set forth fully herein, paragraphs 1 through 33 of this Complaint.

35.     Defendant intentionally and unlawfully discriminated against Plaintiff on the basis of an actual or perceived disability when it refused to make reasonable accommodations for her actual or perceived disability, refused to reinstate her to her position as Batch Release Supervisor, and ultimately terminated her.

36.     Defendant's actions are in direct violation of the ADA.

WHEREFORE, Plaintiff respectfully prays for a judgment against Defendant for back pay and front pay, including lost benefits, compensatory and punitive damages, attorney fees, costs, and such other and further relief as the Court deems just and proper.

**COUNT TWO – VIOLATION OF THE KANSAS ACT AGAINST DISCRIMINATION**

37.     Plaintiff incorporates by reference, as if set forth fully herein, paragraphs 1 through 36 of this Complaint.

38.     Defendant intentionally and unlawfully discriminated against Plaintiff on the basis of an actual or perceived disability when it refused to make reasonable accommodations for her actual or perceived disability, refused to reinstate her to her position as Batch Release Supervisor, and ultimately terminated her.

39.     Defendant's actions are in direct violation of the KAAD.

WHEREFORE, Plaintiff respectfully prays for a judgment against Defendant for back pay and front pay, including lost benefits, compensatory and punitive damages, attorney fees, costs, and such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The plaintiff hereby requests a trial by jury on all issues herein.

## DESIGNATION OF TRIAL

Pursuant to D. Kan. Rule 40.2, the plaintiff designates Wichita, Kansas as the place of trial in the above-captioned matter.

Respectfully submitted,


By  s/ Ryan M. Peck
John W. Johnson, #07684
Ryan M. Peck, #21223
MORRIS, LAING, EVANS, BROCK
   & KENNEDY, CHARTERED
300 N. Mead, Suite 200
Wichita, KS 67202
Telephone: (316) 262-2671
Facsimile: (316) 262-6226
jjohnson@morrislaing.com
rpeck@morrislaing.com
*Attorneys for Plaintiff*